IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | HON. JEROME B. SIMANDLE |
| | : | Criminal No. 08-638 (JBS) |
| v. | : | |
| | : | **OPINION** |
| GAMAL WILLIAMS, | : | |
| Defendant. | : | |

APPEARANCES:

RALPH J. MARRA, JR.
Acting United States Attorney
By:  Jacqueline M. Carle,
     Assistant United States Attorney
401 Market Street, 4th Floor
Camden, New Jersey  08101

Robert R. Simons, Esq.
126 White Horse Pike
Haddon Heights, NJ 08035
     Attorney for Defendant Gamal Williams

**SIMANDLE**, District Judge:

## I.   INTRODUCTION

A vehicle operated by Defendant Gamal Williams was stopped by three City of Camden police officers for what the officers allege was careless driving.  The officers arrested Defendant after discovering a firearm in the vehicle, which the officers contend was in plain view on the center console as Williams drove the vehicle, and which Defendant testified was kept out of sight under the driver's seat.  Mr. Williams was charged with being a

felon in possession of a firearm in violation of 18 U.S.C. §§ 922(g)(1) and 2.

Presently before the Court is Defendant's motion to suppress evidence of the firearm, which he contends was discovered as the result of an unlawful search [Docket Item 15].  For the reasons discussed below, the Court will grant Defendant's motion.

## II.  BACKGROUND

### A.  The Traffic Stop

The facts that give rise to the motion presently under consideration are as follows.[1]  In the early morning hours of February 24, 2008, Officers John J. Galiazzi and Daniel Diaz and Sergeant Jim Wilson, all of the City of Camden Police Department, were on patrol in the area of Ninth Street and Atlantic Avenue in Camden, New Jersey.[2]  At approximately 3:50 a.m., the officers were informed that a 911 call had been placed in which the caller reported hearing gunshots in the officers' vicinity, and the officers circled the area, found no witnesses, and "cleared" the report as unfounded.  After this, the officers parked their

---

[1]  These facts are found from the testimony given by Officers John J. Galiazzi and Daniel Diaz and Defendant Gamal Williams at a hearing convened on May 28, 2009.  The discussion herein accurately summarizes the testimony of these witnesses, although, in view of both parties' election not to order a transcript of the hearing, the Court's discussion contains no citations to the transcript.

[2]  During their testimony, Officers Galiazzi and Diaz characterized this area, and South Camden in general, as having a high rate of drug crime and violent crime.

vehicles[3] on Atlantic Avenue between Eighth and Ninth Streets and stood outside their cars, talking.

Officers Galiazzi and Diaz and Defendant Williams present competing accounts of what happened next.  According to Officer Galiazzi, as the officers were standing outside their vehicles, a black Chevrolet Impala later determined to have been owned and operated by Defendant drove along Atlantic Avenue, stopped approximately one block away from the officers, drove in reverse in order to make a "K" turn in the middle of the street, spun its tires to the point of creating smoke, and proceeded in the direction opposite to that from which it had come.  Officer Diaz testified to a similar series of events, stating that he heard the screeching of Defendant's tires and saw Defendant's vehicle stop in the middle of Atlantic Avenue, turn, and proceed in the opposite direction.[4]  Defendant testified that he did not commit any such motor vehicle violations prior to being pulled over. The officers, believing that Defendant had committed a traffic infraction, got in their vehicles, followed Defendant's vehicle,

---

[3]  Each officer drove alone in his own marked patrol vehicle on the evening of February 24, 2008.

[4]  Diaz's testimony differed from Galiazzi's to the extent that Diaz recalled having initially seen Defendant's car and a vehicle proceeding in the opposite direction come to a stop beside each other before Defendant's vehicle turned around. According to Galiazzi's testimony, the vehicle traveling in the opposite direction drove by Defendant's car without stopping.

activated their flashing lights, and pulled Defendant's car over
at approximately 4:00 a.m.

**B.    The Seizure of the Firearm and Defendant's Arrest**

Officer Diaz and Sergeant Wilson approached on the driver's
side of Defendant's vehicle, while Officer Galiazzi approached on
the passenger's side.  The vehicle's windows were down, and the
officers could see Defendant sitting in the driver's seat and
Defendant's friend, Lee Troy Smith, sitting in the passenger's
seat.  The witnesses offered competing accounts of what
transpired next, and their testimony is reviewed below.

1.   Officer Galiazzi's Testimony

According to Officer Galiazzi's testimony, upon approaching
Defendant's vehicle at the driver's side, Officer Diaz instructed
Defendant to produce his driver's license, vehicle registration,
and proof of insurance, and Officer Galiazzi, on the passenger's
side, asked Mr. Williams and Mr. Smith if they knew anything
about the gunshots that had been reported earlier that evening.
Officer Galiazzi testified that as Defendant lifted the top
portion of the center console between the two seats in order to
access the documents Officer Diaz had requested, Officer
Galiazzi, standing outside the car, shined the light from his
flashlight into the car.  Officer Galiazzi testified that in an
depressed space situated forward of the gear-shift – that is,

4

between the gear-shift and the bottom of the dashboard[5] – he observed a handgun in plain view, at which point he drew his firearm, alerted his fellow officers to the presence of the gun, and ordered Mr. Williams and Mr. Smith to exit the vehicle.

In Officer Galiazzi's telling of the events, the officers pulled Mr. Williams and Mr. Smith from the vehicle, patted them down, handcuffed them, and put them in the back of separate police vehicles; Mr. Williams was placed in Officer Galiazzi's vehicle and Mr. Smith was placed in Officer Diaz's vehicle. Officer Galiazzi retrieved the firearm from Defendant's vehicle, removed the bullet from the chamber for safety purposes, and brought the firearm to the "duty bag" in his police vehicle. According to Officer Galiazzi, when he returned to his police vehicle (where Defendant was detained) with the gun, Defendant, unprompted, blurted out that the gun was his and that Mr. Smith did not know that it was in the vehicle. Officer Galiazzi testified that the officers checked for any outstanding warrants for Mr. Smith, determined that none existed, and released Mr. Smith at the scene.

Officer Galiazzi testified that he drove Defendant from the scene of the arrest to the police station in his police vehicle with no other officer in the vehicle. According to Officer

---

[5]   Officer Galiazzi described the space where he observed the firearm as the indented space in front of the gear shift "where many people put their cell phones."

Galiazzi, Defendant, without being questioned, stated during the drive that he thought that he had placed the gun in the trunk of his car.  Officer Galiazzi testified that he did not respond in any way to Defendant's allegedly unprompted remark, although he recalled that at some point while transporting Defendant to the police station, he asked Defendant whether he had heard the gunshots that had been reported earlier that evening.  Officer Galiazzi concedes that he did not at any point read Defendant the <u>Miranda</u> warnings.

>    2.   <u>Officer Diaz's Testimony</u>

The testimony of Officer Diaz pertaining to the discovery of Defendant's firearm, as well as the arrest and transport of Defendant, differed from Officer Galiazzi's in several significant respects.  First and foremost, Officer Diaz testified that the gun was found in a different location than Officer Galiazzi had indicated.  Although both officers testified that the gun was in plain view, Officer Galiazzi testified that he saw the gun on the flat indented tray near the floor on the forward side of the gear-shift from the driver and passenger seats, while Officer Diaz testified that the gun was positioned barrel-down in the compartment of the console between the two seats such that he could only see the handle.  This console is located between the seats on the near side of the gear-shift.

Like Officer Galiazzi, Officer Diaz testified that Defendant, while detained, stated that the firearm was his, not Mr. Smith's, and like Officer Galiazzi, Officer Diaz testified that Defendant made this statement on his own without being questioned.  Contrary to Officer Galiazzi's testimony, however, Officer Diaz initially testified that he drove Defendant back to the police station himself with no other officers in the car, and that during the ride, he had a conversation with Defendant about the gunshots that had been reported earlier that evening. Officer Diaz also testified that Williams made unprompted incriminating statements to him about the handgun during their patrol car ride back to the police station.  Upon further questioning, however, Officer Diaz stated that while he was sure that he drove either Mr. Williams or Mr. Smith back to the police station, he could not be certain which of the two men he transported.  Officer Diaz also did not give the <u>Miranda</u> warnings to the person he transported, whether it was Mr. Williams or Mr. Smith.[6]

### 3. Defendant Williams' Testimony

Defendant's testimony as to the seizure of the firearm and his arrest contradicts that of the arresting officers on several important points.  First, as was noted above, Defendant denied

---

[6] As was noted, <u>supra</u>, Officer Galiazzi testified that Mr. Smith was released at the scene.

having made a "K" turn or driving in an otherwise careless manner on the night in question.  He testified that he had just exited from I-676 upon his return home from a night out at a club in Philadelphia with his friend Smith, and that he was within a block of his home when he was stopped by the police officers.

With regard to the location of the handgun, while Defendant admitted that the gun was his and that it was in the vehicle that evening,[7] he testified that the gun was kept hidden under the driver's seat in the space between the seat and the floor, and that it was not in plain view at the time of the traffic stop. According to Defendant's testimony, the first thing the officers said upon approaching his vehicle was to ask him if he knew anything about gunshots that had been heard earlier.  After Defendant denied knowing anything about the gunshots, Officer Diaz asked him for his license and registration, and as he was producing these documents, the officers pulled Defendant and Mr. Smith out of the vehicle, patted them down, and placed them in the back of separate police cars.  From the police car, Defendant testified, he could see Officer Galiazzi searching his car, where Officer Galiazzi found the firearm under the driver's seat.[8]

_____

[7]  According to Defendant, the gun was inoperable, but he kept it in the automobile for protection – that is, to be brandished but not used.

[8]  Defendant also testified as to the dimensions of the space in his car where Officer Galiazzi claims to have seen the firearm in plain view.  According to Defendant, the space between

Defendant is also sure that it was Officer Diaz – whom he knew personally as a neighbor – who transported him back to the police station, not Officer Galiazzi.

### C.    Procedural History

On September 9, 2008, the Grand Jury returned a one-count Indictment against Defendant, charging him with being a felon in possession of a firearm,[9] in violation of 18 U.S.C. §§ 922(g)(1) and (2).  On April 24, 2009, Defendant filed a motion to suppress evidence of the handgun [Docket Item 15].  The Court convened a hearing to address Defendant's motion on May 28, 2009 at which it heard the testimony of Officers Galiazzi and Diaz and the Defendant, as well as oral argument from both parties; the Court reserved decision on Defendant's motion.

## III. DISCUSSION

The Fourth Amendment protects "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S. Const. amend. IV.  As the following discussion makes clear, the lawfulness of the

---

the gear shift and the dashboard is not depressed or indented as Officer Galiazzi described, but is instead flat on the bottom, roughly nine inches long, and less than one inch high around the edge like a tray.  He made the point that if his gun were placed on that tray, it would not stay put, especially through the sorts of maneuvers with screeching tires and a K-turn that the officers say they saw.

[9]  Defendant testified on cross-examination that he has a lengthy criminal history, including multiple convictions for drug distribution and violent crimes.

officers' conduct at issue herein, for Fourth Amendment purposes, turns on two considerations: whether the initial stop of Defendant's vehicle was lawful, and whether the officers lawfully seized Defendant's firearm, which the Government seeks to justify under the "plain view" doctrine.  As the Court now explains, while it finds that the initial stop of Defendant's vehicle was lawful, it does not find that the Government has demonstrated that the firearm was in plain view at the time it was seized, and will accordingly grant Defendant's motion to suppress the firearm.[10]

---

[10]  As the preceding summary of the testimony indicates, no officer read Defendant his <u>Miranda</u> warnings until after he had been taken to the police station, and it appears that Defendant's statement that he believed the firearm was in the trunk was made while he was in custody (in the police car) and while either Officer Galiazzi or Officer Diaz was asking him about the gunshots that had been reported earlier that evening.  Had the Court concluded that the prior stop and seizure were both lawful, a question would exist as to whether the admission of this statement would run afoul of Defendant's Fifth Amendment privilege against self-incrimination under <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966).  However, because the Court concludes that the firearm was not lawfully seized, Defendant's statements concerning the gun are inadmissible as "fruit of the poisonous tree," and must likewise be suppressed.  <u>See</u> <u>Wong Sun v. United States</u>, 371 U.S. 471, 488 (1963) (suppression called for where evidence "has been come at by exploitation of [the initial] . . . illegality" unless evidence was obtained "by means sufficiently distinguishable to be purged of the primary taint").  The Government has not suggested that any of the three exceptions to the "fruit of the poisonous tree" doctrine – "(1) the independent source exception; (2) the inevitable discovery exception; and (3) the attenuated basis exception," <u>United States v. Davis</u>, 332 F.3d 1163, 1171 (9th Cir. 2003) – is applicable here.

### A.    The Traffic Stop

First, the Court concludes that the initial traffic stop was not unlawful.  "A traffic stop is a 'seizure' within the meaning of the Fourth Amendment, even though the purpose of the stop is limited and the resulting detention quite brief."  United States v. Delfin-Colina, 464 F.3d 392, 396 (3d Cir. 2006) (internal quotations and citations omitted).  "It is well-established that a traffic stop is lawful under the Fourth Amendment where a police officer observes a violation of the state traffic regulations."  United States v. Moorefield, 111 F.3d 10, 12 (3d Cir. 1997) (citing Pennsylvania v. Mimms, 434 U.S. 106, 109 (1977)); see also United States v. Bonner, 363 F.3d 213, 216 (3d Cir. 2004); United States v. Kithcart, 218 F.3d 213, 219 (3d Cir. 2000).  A traffic stop based upon a traffic violation "will be deemed a reasonable 'seizure' when an objective review of the facts shows that an officer possessed specific, articulable facts that an individual was violating a traffic law at the time of the stop."[11]  Delfin-Colina, 464 F.3d at 398 (citations omitted.)

The Court finds that such an objective review of the facts reveals that the officers had a reasonable basis to believe that Defendant had violated New Jersey's careless driving statute,

---

[11]    The Court of Appeals has made clear that "'probable cause' is not required for a traffic stop to be reasonable under the Fourth Amendment."  Christopher v. Nestlerode, 240 Fed. Appx. 481, 487 n.3 (3d Cir. 2007) (citing Delfin-Colina, 464 F.3d at 397) (emphasis in original).

N.J.S.A. 39:4-97, and thus had an objective justification for the traffic stop.  New Jersey's careless driving statute prohibits "driv[ing] a vehicle carelessly, or without due caution and circumspection, in a manner so as to endanger, or be likely to endanger, a person or property."  N.J.S.A. 39:4-97.  In this case, Officers Galiazzi and Diaz testified credibly that, in the middle of Atlantic Avenue, Defendant came to a stop, drove in reverse on the wrong side of the street in order to execute a "K" turn, and spun the wheels of his vehicle to the point of creating smoke and, according to Diaz, a screeching noise.  Although the incident occurred late at night when few cars were on the road, the street was not deserted – both officers testified that a car was proceeding in the direction opposite to Defendant's at the time the officers observed Defendant stopping, reversing, and spinning his tires, thus increasing the potentially dangerous nature of Defendant's maneuvers.  See State v. Dorko, 298 N.J. Super. 54, 60 (App. Div. 1997); see also United States v. Scopo, 19 F.3d 777, 782 (2d Cir. 1994) ("When an officer observes a traffic offense – however minor – he has probable cause to stop the driver of the vehicle") (citation omitted).

The Court finds the testimony of Officers Galiazzi and Diaz on the matter of Defendant's driving to be credible.  Each officer (who was sequestered during the testimony of the other officer) testified to roughly the same course of conduct by

Defendant – that he stopped in the middle of the road, drove a very short distance (perhaps three car-lengths) in reverse (and thus in the wrong direction for the lane he was driving in), spun his tires to the point of generating smoke, and proceeded in the opposite direction, and that another vehicle was driving on the road while this careless driving was taking place. Based upon the officers' testimony, which (with regard to Defendant's driving) the Court credits, the Court concludes that the officers had "a minimal level of objective justification," Delfin-Colina, 464 F.3d at 396 (citation omitted), to believe that Defendant was driving "carelessly . . . in a manner . . . likely to endanger[] a person or property."[12]  N.J.S.A. 39:4-97; cf. United States v. $33,500 in U.S. Currency, No. 86-3348, 1988 WL 169272, at *6 n.1 (D.N.J. Aug. 17, 1988) ("cross[ing] over the white dotted center lane divider several times and . . . travel[ing] over the solid white line onto the right shoulder of the roadway" violates

---

[12]  The Court is unpersuaded by Defendant's argument that the failure of the officers to issue Defendant a ticket for his traffic infraction undercuts the legality of the traffic stop at issue herein.  As the Government correctly argues, the legality of a traffic stop is based upon whether the officer's observations gave the officer an objective basis to believe that a traffic violation had occurred, Delfin-Colina, 464 F.3d at 396, not whether the Defendant ultimately received a ticket for the traffic infraction.  See, e.g., United States v. Dhinsa, 171 F.3d 721, 725-26 (2d Cir. 1998).  Nor does the fact that "traffic arrests were not necessarily part of [these officers'] . . . usual duties . . . negate the fact that they directly observed [Defendant] violating the traffic laws and thus had [an objective basis] . . . to arrest him."  United States v. Scopo, 19 F.3d 777, 798 (2d Cir. 1994).

N.J.S.A. 39:4-97).  The Court thus concludes that the traffic stop did not itself constitute an unlawful seizure.  <u>See</u> <u>Moorefield</u>, 111 F.3d at 12.

**B.   The Seizure of Defendant's Firearm**

The second question implicated by the officers' conduct on the evening of February 24, 2008 is whether the officers lawfully seized Defendant's firearm, or, alternatively, whether the discovery of the firearm was the product of an unlawful search. The Government contends that Defendant's firearm was in plain view at the time of the traffic stop, arguing that its seizure was justified under the plain view exception to the Fourth Amendment's warrant requirement.  For the reasons that follow, the Court finds that the Government has not proved by a preponderance of the credible evidence that Defendant's firearm was in plain view at the time it was allegedly observed by Officers Galiazzi and Diaz, and will grant Defendant's motion to suppress evidence of the firearm.

The Supreme Court has recently reiterated the basic principle that "searches conducted outside the judicial process, without prior approval by judge or magistrate, are <u>per</u> <u>se</u> unreasonable under the Fourth Amendment – subject only to a few specifically established and well-delineated exceptions.'" <u>Arizona v. Gant</u>, --- U.S. ----, 129 S. Ct. 1710, 1716 (2009) (quoting <u>Katz v. United States</u>, 389 U.S. 347, 357 (1967)).  One

such exception is the plain view doctrine.  In discussing the
parameters of the plain view exception to the Fourth Amendment's
warrant requirement, the Court of Appeals recently explained:

> If police are lawfully in a position from which they view
> an object, if its incriminating character is immediately
> apparent, and if the officers have a lawful right of
> access to the object, they may seize it without a
> warrant.  If, however, the police lack probable cause to
> believe that an object in plain view is contraband
> without conducting some further search of the object –
> i.e., if its incriminating character [is not] immediately
> apparent – the plain-view doctrine cannot justify its
> seizure.

United States v. Yamba, 506 F.3d 251, 257-58 (3d Cir. 2007)

(internal quotations and citations omitted).  The application of

the plain view doctrine thus turns on three requirements: (1)

"the officer must not have violated the Fourth Amendment in

arriving at the place from which the evidence could be plainly

viewed"; (2) "the incriminating character of the evidence must be

immediately apparent"; and (3) "the officer must have a lawful

right of access to the object itself."  United States v. Menon,

24 F.3d 550, 559 (3d Cir. 1994) (internal quotations and

citations omitted).

In this case, the Court has already found, supra, that the

officers performed a lawful traffic stop – i.e., that they

lawfully "arriv[ed] at the place from which the evidence could

[allegedly] be plainly viewed."  Id.  Moreover, there can be no

doubt that the incriminating character of a handgun would be

immediately apparent to the officers if they had observed it in

plain view – New Jersey law criminalizes the possession of unlicensed handguns, N.J.S.A. 2C:39-5(b), and contains a presumption that the possession of a handgun is unlicensed until the person possessing the firearm establishes the contrary. N.J.S.A. 2C:39-2(b); see also United States v. Karriem, No. 07-706, 2008 WL 5118200, at *5 (D.N.J. Dec. 4, 2008) (incriminating nature of handgun is immediately apparent).

Whether the officers lawfully seized Defendant's handgun thus turns on whether the Government has proved by a preponderance of the evidence that the handgun was visible to the officers at the time the they stood outside of Defendant's vehicle.[13]  See id. at *6 (finding the lawful right of access prong satisfied in an automobile case "where the evidence may be viewed from outside the vehicle by either inquisitive passersby or diligent police officers") (internal quotations and citations omitted).

The Court concludes that the Government has not sustained its burden on this point.  Put simply, the Court finds

---

[13]  The Government's argument as to the legality of Officer Galiazzi's seizure of Defendant's firearm rests exclusively upon its contention that the gun was in plain view at the time it was seized.  The Government does not suggest that it would have been lawful for Officer Galiazzi to have conducted a search of Defendant's automobile if the firearm had not been in plain view. See Gant, 129 S. Ct. at 1723-34 (warrantless search of automobile permissible "only if the arrestee is within reaching distance of the passenger compartment at the time of the search or it is reasonable to believe the vehicle contains evidence of the offense of arrest").

Defendant's testimony that the firearm was kept out of sight under the driver's seat to be more credible than the officers' contention that the gun was in plain view on the console.

Several considerations inform this determination.  First, the testimony of Officer Galiazzi and Officer Diaz on the matter of where they observed the firearm in plain view was irreconcilably inconsistent.  Officer Galiazzi testified that upon shining his flashlight into Defendant's vehicle, he observed the firearm in a recessed space forward of the gear-shift and just below the dashboard – that is, on the opposite side of the gear-shift from the driver's and passenger's seats.  Officer Diaz, by contrast, testified quite vividly that he recalled seeing the firearm barrel-down, handle-up in the deep storage compartment of the console between the two seats.  While such an inconsistency would be of less significance in the absence of evidence placing the gun in a different location altogether, Defendant testified credibly that the handgun was not kept out in the open, but was instead kept out of sight under the driver's seat.  The inconsistency between the testimony of Officers Galiazzi and Diaz as to the location of the firearm – the issue at the heart of the Government's contention that the evidence was in plain view – undermines the force of the Government's proofs on this point.

The Court has considered the possibility, urged by the
Government, that Officer Galiazzi's and Officer Diaz's testimony
on this point can be reconciled by the fact that the two men
allegedly saw the firearm from different angles.  The Court does
not find this argument persuasive.  While Galiazzi and Diaz
inarguably had different vantage points from which to view the
interior of Defendant's vehicle – Galiazzi was on the passenger's
side while Diaz was on the driver's side – this fact cannot
reconcile the discrepancies in their testimony, with Galiazzi
having recalled seeing the gun lying flat in the space forward of
the gear-shift (and in front of the driver and passenger seats),
and Diaz testifying that the gun was in the deep console
compartment between the two seats.  From opposite sides of
Defendant's car, Galiazzi and Diaz would each have been able to
distinguish between whether the gun was behind or in front of the
gear-shift, and whether it was in front of or in between the
driver and passenger seats, and no trick of angles can explain
the inconsistency in their testimony on this point.  Also, Diaz
describes a gun pointed downward with its handle upward, while
Galiazzi describes a gun lying flat horizontally.  There simply
is no way to reconcile the two officers' testimony such that the
officers can be said to have described seeing the same thing,
which casts considerable doubt upon whether either officer saw
the gun in plain view at all.

18

The location of the handgun was not the only point of irreconcilable inconsistency between Officer Galiazzi's and Officer Diaz's testimony as to the events surrounding this arrest.  While Officer Galiazzi testified that Mr. Smith was released at the scene upon the officers' verification that no outstanding arrest warrants existed for Mr. Smith's arrest, Officer Diaz testified that Mr. Smith was driven to the police station by one of the arresting officers.  Each officer personally recalled having driven alone with Defendant from the scene of the arrest to the police station, and each even testified to statements Defendant allegedly made to him while being transported.[14]  Both versions cannot be true, as only one officer could possibly have driven Williams and personally heard his statements that night.  At least one officer has therefore testified to Williams having a conversation with the officer that could not have happened.  These are not trivial discrepancies, but are, instead, fundamental facts concerning the events of February 24, 2008.  The officers' inconsistent testimony on these matters, together with their conflicting testimony as to the more fundamental question of the location of the firearm, erodes the

---

[14]  Upon cross-examination and further questioning from the Court, Officer Diaz conceded that he may have driven Mr. Smith, not Defendant, back to the police station.  This testimony is itself inconsistent with that of Officer Galiazzi, who testified that Mr. Smith was released at the scene – that is, that no officer drove him from the scene of the arrest to the police station.

Court's confidence in the accuracy of the officers' recollection of these events, and undermines the persuasiveness of the officers' testimony.

As to Defendant's testimony that the firearm was kept below the driver's seat of his vehicle, several points bear recognition.[15]  First, the Court agrees with Defendant that his position as to the location of the firearm is more easily squared

---

[15] The Court is mindful of the Government's proffer, as impeachment evidence, of the fact that Williams has a criminal record of prior felony convictions and that he has used aliases on 5 or 6 occasions.  His convictions included drug distribution and unspecified crimes of violence, but no crimes related to an act of dishonesty or false statement under Rule 609(b), Fed. R. Evid.  At the hearing, the Court was not informed of the specific convictions or their dates for purposes of the ten-year rule of Rule 609(b), nor was there any specificity for the Court to make the determination of admissibility under Rule 609(a)(1) ("evidence that an accused has been convicted of such a crime shall be admitted if the court determines that the probative value of admitting this evidence outweighs its prejudicial effect to the accused").  Nonetheless, the Court, recognizing that the rules of admissibility are not strictly applied in suppression hearings, see United States v. Matlock, 415 U.S. 164 (1974); United States v. Redd, 318 F.3d 778 (8th Cir. 2003); United States v. Portala, 985 F.2d 621 (1st Cir. 1993), permitted the Government to make use of such felony convictions for purposes of impeachment of the accused.  Having done so, the Court finds that the impeachment evidence is entitled to little weight in these circumstances.  Defendant has made candid statements claiming his ownership of the handgun and exonerating his passenger from the night of arrest until the time of this hearing, accepting the blame.  A person convicted of felonies in the past, unrelated to truthfulness, can be quite capable of telling the truth now.  He has not been undermined by inconsistent statements or lack of candor.  This is the perhaps unusual case where his recitation of events simply carries a greater ring of the truth and reliability than the officers who must attempt to recollect events that occurred more than 15 months ago, where it is also clear that at least one of the officers testified to a conversation he could not have had with this defendant.

with common sense than is the officers' inconsistent testimony on this matter.  See, e.g., United States v. Yu-Leung, 51 F.3d 1116, 1119 (2d Cir. 1995) (recognizing that courts, like jurors, may account for common sense in evaluating a witness's credibility).  The notion that an individual with Defendant's history of encounters with law enforcement would, upon being stopped by police officers, place something as incriminating as a firearm in open view is less plausible than Defendant's testimony on this issue, which was that he kept the gun out of sight under the driver's seat.  In this respect, the Government's argument that the Court should account for Defendant's incentive to give false testimony and Defendant's history of criminal activity in measuring his credibility does not cut as favorably in the Government's favor as it contends, for those same incentives and history of encounters with law enforcement suggest, as Defendant testified, that Defendant would not have kept a firearm on the console and in plain view as police officers stopped and approached his car.  Further, Defendant would not likely have exposed the gun to the officers' view when he knew, from the flashing police lights on the marked cars, that the police were about to pull him over.  Even if he was riding around with the gun on the forward shallow tray, an assumption the Court finds to be highly unlikely given the instability of a gun upon the shallow tray and the lack of concealment itself, it is

21

implausible that he would have just left that weapon lying there as the police approached from a block away, signaling him to stop his car.

In summary, based upon the contents of the testimony at the May 28, 2009 hearing and its assessment of the witnesses' demeanor, the Court concludes that the Government has not proved by a preponderance of the evidence that the firearm was in plain view at the time the officers approached Defendant's vehicle. The Government has thus failed to establish that the plain view exception to the rule that "searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment," Gant, 129 S. Ct. at 1716 (citation omitted), applies to the circumstances presented here.  The inculpatory statements attributed to Defendant must likewise be suppressed as they flowed directly and proximately from the officers' unconstitutional search and seizure of the gun.  See United States v. Pelullo, 173 F.3d 131, 136 (3d Cir. 1999); see also Note 10, supra.  The Court will accordingly grant Defendant's motion to suppress evidence of the firearm and of Defendant's post-seizure statements.

**IV.  CONCLUSION**

For the reasons set forth above, Defendant's motion to suppress evidence of the firearm will be granted, and evidence of

22

Defendant's statements is likewise suppressed.  The accompanying

Order is entered.


**June 3, 2009**                    **s/ Jerome B. Simandle**
Date                                JEROME B. SIMANDLE
                                    United States District Judge

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

UNITED STATES OF AMERICA,

      v.

GAMAL WILLIAMS,

          Defendant.

HON. JEROME B. SIMANDLE

Criminal No. 08-638 (JBS)

**ORDER**

    This matter having come before the Court upon Defendant's motion to suppress evidence of the firearm seized on February 24, 2008 [Docket Item 15]; the Court having considered the submissions of the parties in support thereof and opposition thereto, as well as the testimony and arguments presented at the May 28, 2009 hearing; for the reasons explained in the Opinion of today's date; and for good cause shown;

    IT IS this    **3rd**    day of **June, 2009** hereby

    ORDERED that Defendant's motion to suppress evidence of the firearm shall be, and hereby is, **GRANTED**.


**s/ Jerome B. Simandle**
JEROME B. SIMANDLE
United States District Judge